79252-7

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division

CIVIL ACTION CASE NO.

NATIONWIDE LABORATORIES LLC., a New
Jersey Limited Liability Company,
BI-COASTAL PHARMACEUTICAL CORP., a
New Jersey Corporation,
BI-COASTAL PHARMA INTERNATIONAL
LLC., a New Jersey Limited Liability Company,
RALPH MASSA, JR., and KRISTINA SUSAN
JOHNSON,

     Plaintiffs,

vs.

ECI PHARMACEUTICALS LLC, a Florida
Limited Liability Company,

     Defendant.

_____/

## COMPLAINT

Plaintiffs NATIONWIDE LABORATORIES LLC, a New Jersey Limited Liability Company, BI-COASTAL PHARMACEUTICAL CORP.[1], a New Jersey Corporation, BI-COASTAL PHARMA INTERNATIONAL LLC, a New Jersey Limited Liability Company, RALPH MASSA, JR. and KRISTINA SUSAN JOHNSON, by and through their undersigned Counsel sues the Defendant ECI PHARMACEUTICALS LLC, a Florida Limited Liability Company, and alleges:

---

[1] BI-COASTAL PHARMACEUTICAL CORP. is a dissolved inactive corporation. It is named as a Plaintiff in this lawsuit to the extent it could be viewed as an indispensable party to this action seeking declaratory relief concerning a contract which it joined (solely) as a guarantor. *See* Fed. R. Civ. P. 19.

CASE NO.

Introduction

Plaintiff NATIONWIDE LABRATORIES LLC ("Nationwide") agreed to compensate ECI PHARMACEUTICALS LLC ("ECI") for (i) the use of its technology package and (ii) the use of its suppliers of Active Pharmaceutical Ingredient "API" for two (2) products: Salsalate and Phenazopyridine (the "Products"). These agreements were memorialized in contracts dated March 6, 2012 (Salsalate Agreement) and March 14, 2012 (Phenazopyridine Agreement"). Plaintiffs BI-COASTAL PHARMACEUTICAL CORP., BI-COASTAL PHARMA INTERNATIONAL LLC., RALPH MASSA, JR., and KRISTINA SUSAN JOHNSON (collectively the "Guarantors") were guarantors of these agreements.

Thereafter, the relationship between Nationwide and ECI deteriorated and Nationwide began using a different company ("New Manufacturer")[2] to manufacture these Products. The New Manufacturer uses its own technology package and API supplied by Nationwide (or its affiliates). Notably, ECI never disclosed the name(s) of its API suppliers to Nationwide, and Nationwide has returned the technology package to ECI and is no longer using ECI's API suppliers. ECI has now alleged that Nationwide owes ECI commission under the Agreements for all of its sales of the Products despite the fact that the ECI technology package and API suppliers are not used in the current manufacturing process. Thus there is a real and actual controversy between the Parties, and this lawsuit for declaratory relief follows.

---

[2] Nationwide does not want to specifically name the New Manufacturer at this time as that is proprietary information, and based on ECI's past actions there is a real and present harm that ECI may attempt to improperly interfere with that relationship. The identity of the New Manufacturer is not germane to the declaratory relief sought herein. Nationwide will, of course, provide this information to the Court in camera upon request.

CASE NO.

Moreover, Nationwide's affiliate (and guarantor) Bi-Coastal Pharma International, LLC ("Bi-Coastal") has recently learned that ECI has been making false and defamatory statements concerning Bi-Coastal's marketing of Salsalate and, in at least one instance, has caused Bi-Coastal to suffer significant damages by tortiously interfering with a prospective business arrangement.

PROCEDURAL STATEMENT

1.   The nature of this complaint is a proceeding for a declaratory judgment under § 2201 of the Judicial Code (28 U.S.C. § 2201) for the purpose of determining a question in actual controversy between the parties, namely, the question of the validity and interpretation of two (2) related written contracts and the parties rights and responsibilities thereunder.

2.   Bi-Coastal also brings common claims for defamation and tortious interference with advantageous business relationships against ECI for its wrongful conduct as set forth more fully below.

PARTIES

3.   Plaintiff, Nationwide Laboratories LLC, is a limited liability company organized under the Laws of the State of New Jersey and with its principal place of business in New Jersey.  Its sole member is a citizen of the State of New Jersey.

4.   Plaintiff, Bi-Coastal Pharmaceutical Corp. was a New Jersey corporation, which has since been dissolved.

5.   Plaintiff, Bi-Coastal Pharma International LLC , is a limited liability company organized under the Laws of the State of New Jersey and with its principal place of business in New Jersey.  Its sole member is a citizen of the State of New Jersey.

CASE NO.

6.    Plaintiff, Ralph Massa, Jr. is the President and Chief  Executive Officer of Bi-Coastal Pharma International LLC and Nationwide Laboratories LLC and is a citizen of New Jersey.

7.    Plaintiff Kristina Susan Johnson is the wife of Ralph Massa, Jr. and is a citizen of New Jersey.

8.    Defendant, ECI, is a limited liability company organized under the Laws of the State of Florida and its two members are both citizens of the State of Florida.

JURISDICTION & VENUE

9.    Plaintiff, Nationwide, has its principal place of business in the State of New Jersey.

10. Plaintiff, Bi-Coastal Pharmaceutical Corp. was a New Jersey corporation, which has since been dissolved.

11. Plaintiff,  Bi-Coastal  Pharma  International  LLC , is  a  limited  liability  company organized under the Laws of the State of New Jersey and its sole member is a citizen of the State of New Jersey.

12. Plaintiff, Ralph Massa, Jr. is the President and Chief Executive Officer of Bi-Coastal Pharma International LLC and Nationwide Laboratories LLC and is a citizen of the State of New Jersey.

13. Plaintiff Kristina Susan Johnson is the wife of Ralph Massa, Jr. and is a citizen of the State of New Jersey.

14. ECI's principal place of business is the State of Florida.

15. ECI is threatening to sue Nationwide for alleged damages exceeding $75,000.00.

16. For diversity purposes Nationwide is deemed a citizen of the New Jersey.  There is complete diversity between the parties, and as the matter in controversy, exclusive of interest and costs, exceeds the sum of $75,000 this Court has jurisdiction. 28 U.S.C. § 1332.

CASE NO.

17. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because ECI resides in Broward County, Florida.

FACTUAL BACKGROUND

ECI Agrees to License Technical Information and Active Pharmaceutical Ingredients to Nationwide for the Manufacture of Salsalate

18. Nationwide and ECI entered in to an Agreement on March 6, 2012 whereby Nationwide would compensate ECI for the use of certain technical information (this is referred to as the "technology package") which contains suppliers of the necessary Active Pharmaceutical Ingredients ("APIs") for the manufacture of a product called Salsalate.[3]

19. Salsalate is a nonsteroidal anti-inflammatory drug (NSAID).

20. Under the Salsalate Agreement, Nationwide could license the technology package from ECI to manufacture Salsalate 500 mg and 750mg on a non-exclusive basis.  Exhibit 1, ¶ 3(a).

21. ECI was also to acquire the APIs necessary to manufacture the product for Nationwide.

22. ECI never revealed the identity of its API suppliers to Nationwide.

23. According to the express terms of the Salsalate Agreement, Exhibit 1, ¶3(b), should Nationwide have the Salsalate manufactured using ECI's technology package and APIs, Nationwide would pay ECI a commission as follows:

     i.  For Salsalate 500mg tablets, 100 count bottle- $8.84 per bottle; and

     ii.  For Salsalate 750mg tablets, 100 count bottle- $12.43 per bottle.

24. Additionally, Nationwide and ECI also agreed to split Net Profits 50/50 for sales of Salsalate manufactured using ECI's technology package.  Exhibit 1, ¶3(d).

CASE NO.

25. The Salsalate Agreement was guaranteed by Bi-Coastal Pharmaceutical Corp., Bi-Coastal Pharma International LLC, Ralph Massa, Jr. and Kristina Susan Johnson.

<u>ECI Agrees to License Technical Information and Active Pharmaceutical Ingredients to Nationwide for the Manufacture of Phenazopyridine</u>

26. Nationwide and ECI entered in to an Agreement on March 14, 2012 whereby Nationwide would compensate ECI for the use of certain technical information (this is referred to as the "technology package") which contains suppliers of the necessary Active Pharmaceutical Ingredients ("APIs") for the manufacture of a product called Phenazopyridine. [4]

27. Phenazopyridine is a drug used to treat urinary tract infections.

28. Under the Phenazopyridine Agreement, Nationwide would license the technology package from ECI to manufacture Phenazopyridine on a non-exclusive basis.  Exhibit 2, ¶ 3(a).

29. ECI was also to acquire the APIs necessary to manufacture the product for Nationwide.

30. ECI never revealed the identity of its API suppliers to Nationwide.

31. According to the express terms of the Phenazopyridine Agreement, Exhibit 2, ¶3(b), should Nationwide have the Phenazopyridine manufactured using ECI's technology package and APIs, Nationwide would pay ECI the invoiced cost of all API provided by or through ECI used to manufacture the product.

32. Additionally, Nationwide and ECI also agreed to split Net Profits 25/75 for sales of Phenazopyridine made using ECI's technology package. Exhibit 2, ¶3(d).

---

[3] A true and correct copy of the Salsalate Agreement is attached hereto as Exhibit 1.
[4] A true and correct copy of the Phenazopyridine Agreement is attached hereto as Exhibit 2.

CASE NO.

33. The Phenazopyridine Agreement was guaranteed by Bi-Coastal Pharmaceutical Corp., Ralph Massa, Jr. and Kristina Susan Johnson.

<u>Nationwide Begins Using a New Manufacturer for the Manufacture of Salsalate and Phenazopyridine</u>

34. The relationship between Nationwide and ECI began to deteriorate around the end of 2012.

35. After the relationship deteriorated, Nationwide returned the technology packages to ECI. Exhibit 3 (Massa Affidavit) at ¶ 7.

36. Nationwide did not have knowledge of ECI's API supplier(s) for Salsalate or Phenazopyridine. Id. ¶¶ 5, 11.

37. Nationwide independently contacted a New Manufacturer to manufacture both Salsalate and Phenazopyridine. The New Manufacturer provided its own technology package for the manufacture of Salsalate and Phenazopyridine. Id. ¶ 8-10.

38. Nationwide or its affiliate Bi-Coastal Pharma International LLC has purchased the API for the manufacture of the Salsalate and Phenazopyridine.  Neither Nationwide nor Bi-Coastal Pharma International LLC) has knowingly used ECI's suppliers for these purchases. Id. ¶ 11.

39. ECI began marketing Salsalate and Phenazopyridine in early 2014 and has been a competitor of Nationwide since that time.  Upon information and belief, ECI has learned through the industry that Nationwide has been marketing Salsalate and Phenazopyridine manufactured by a new manufacturer.

CASE NO.

### ECI Communicates that it is Owed Payment for the Products Sold that were Manufactured by Nationwide's New Manufacturer

40. ECI has recently indicated that it believes Nationwide is using their technology package with the New Manufacturer for the production of Salsalate and Phenazopyridine.

41. ECI has further indicated that it believes it is owed a commission from the sale of Salsalate and Phenazopyridine manufactured by the New Manufacturer.

### ECI Interferes with Bi-Coastal's Prospective Business Relationship with Acella Pharmaceuticals

42. In or about October of 2014, Nationwide's affiliate Bi-Coastal Pharma International, LLC ("Bi-Coastal") was approached by two (2) executives with Acella Pharmaceuticals, LLC ("Acella") inquiring whether Bi-Coastal may be interested in selling its business for Salsalate.

43. Bi-Coastal and Acella negotiated a Mutual Non-Disclosure and Confidentiality Agreement (the "Agreement") to provide a framework for the sharing of Confidential Information in furtherance of discussions intended to culminate in the purchase of Bi-Coastal's Salsalate business.

44. On October 23, 2014, Bi-Coastal advised Acella that it had Salsalate API in stock which was ready to be put into production for approximately 5,000,000 tablets of finished product. Shortly thereafter, Bi-Coastal provided Acella with Certificates of Authenticity ("COAs") for three (3) separate lots of Salsalate API in stock. These COAs identified Bi-Coastal's API supplier.

45. Bi-Coastal continued to provide Acella with internal Confidential Information including customer identifying information and sales histories (reflecting customer preferences, pricing and profitability).

CASE NO.

46. On November 6, 2014, Mr. Massa emailed Acella outlining the general parameters for Acella's acquisition of Bi-Coastal's Salsalate business. Mr. Massa proposed a closing to occur on or before December 15, 2014.

47. Confidential Information continued to be shared with Acella. On November 17, 2014, Mr. Massa emailed the Acella executives to inquire if they still had interest in moving forward with the transaction.

48. Acella executive Mr. Deas promptly responded and asked Mr. Massa to suggest a price for the sale of Bi-Coastal's Salsalate business. Mr. Deas did not request any additional information from Bi-Coastal at that time.

49. Mr. Massa responded, suggesting a transaction price of 1X annual net sales. Based on the progression of the dealings with Acella and its apparent satisfaction with the Confidential Information that had been disclosed, Mr. Massa was of the belief that the transaction would close in the near future at or near his suggested transaction price.

50. However, less than an hour later, Mr. Deas responded, "Ralph I cannot get john Companos [sic] to return my calls."

51. John Copanos is the CEO of ECI Pharmaceuticals, LLC ("ECI"), a direct competitor of Bi-Coastal. As of November of 2014, Bi-Coastal and ECI were involved in active, adverse litigation.

52. Bi-Coastal did not hear further from Acella regarding its planned buy-out of its Salsalate business.

53. A few months later Bi-Coastal was approached by its primary Salsalate customer, AmerisourceBergen, asking if Bi-Coastal could match a price that had been bid by Acella. Bi-Coastal agreed to match Acella's bid, resulting in significant lost profits.

CASE NO.

54. In June of 2015, counsel for Bi-Coastal wrote Acella asking questions regarding Acella's use of Bi-Coastal's information and demanding that all Confidential Information it had provided be returned and/or destroyed.

55. Acella's response was rather illuminating.  Therein, Acella's Chief Legal Officer stated that Acella had been unable to consummate the buy-out of Bi-Coastal's Salsalate business due to "serious doubts about Bi-Coastal's title to the Salsalate product, and what appeared to be troubling lapses in Bi-Coastal's compliance with Title 21 of the United States Code and other regulations."

56. The response continued that:

"Acella was deeply concerned about the integrity of Bi-Coastal's title to the Salsalate product <u>after it learned that Bi-Coastal may have appropriated it from a third party that still asserted ownership of both the product and its formulation, specifications, analytical methods and other associated intellectual property</u>. Needless to say, Acella was hardly going to close on a product that Bi-Coastal had dubious ability to validate as its own, sole property.

Finally, Acella determined that Bi-Coastal had apparently extended the dating of units of the Salsalate product already in the market by a year, without informing or obtaining the permission of its manufacturer…" (emphasis supplied)

57. These allegations contained within Acella's response are patently false.

58. As discussed above, the only third party known to Bi-Coastal that has (wrongfully) claimed an ownership interest in Bi-Coastal's Salsalate business is its former supplier ECI. Acella's communications with Bi-Coastal reflected that it was discussing Salsalate business with ECI, to some extent, and Bi-Coastal cannot think of any individual or entity other than ECI (or its CEO John Copanos) that could have originally made the false accusations contained in Acella's response.

59. Acella discontinued its proposed buy-out of Bi-Coastal's Salsalate business as the result of ECI's dissemination of false and defamatory statements to Acella.

CASE NO.

60. This lawsuit follows.

### COUNT I
(Declaratory Judgment:  Nationwide and its Guarantors)

61. Plaintiffs hereby adopt and reincorporate herein by reference the allegations contained in paragraphs one (1) through forty one (41) as though fully set forth herein.

62. An actual controversy has arisen and now exists relating to the rights and duties of the parties to this action.

63. ECI contends that it is owed commission from Nationwide for Salsalate and Phenazopyridine manufactured by the New Manufacturer.

64. Nationwide contends that it does not owe commission for the Salsalate and Phenazopyridine manufactured by the New Manufacturer because neither ECI's technology package nor ECI's API or API suppliers were used in the manufacture of these products.

65. A declaratory judgment by this Court would provide immediate relief to Nationwide and prevent ECI from filing a suit against Nationwide.

WHEREFORE Plaintiffs Nationwide and the Guarantors respectfully requests this Honorable Court enter judgment finding:

1. that the Salsalate Agreement [Exhibit 1] governs the relationship between Nationwide and ECI relative to the payment terms due for the supply of Salsalate;

2. that Nationwide does not owe ECI any compensation under the Salsalate Agreement for any Salsalate it has marketed that did not use ECI's technology package or API/API suppliers, including Salsalate manufactured by New Manufacturer;

CASE NO.

3.  that the Phenazopyridine Agreement [Exhibit 2] governs the relationship between Nationwide and ECI relative to the payment terms due for the supply of Phenazopyridine;

4.  that Nationwide does not owe ECI any compensation under the Phenazopyridine Agreement for any Phenazopyridine it has marketed that did not use ECI's technology package or API/API suppliers, including Phenazopyridine manufactured by New Manufacturer; and

5.  for any other relief that this Honorable Court may deem necessary and just.

<u>COUNT II</u>
(Defamation: Bi-Coastal)

66.  Plaintiff, Bi-Coastal hereby adopts and reincorporates herein by reference the allegations contained in paragraphs one (1) through sixty (60).

67.  ECI manufactured Salsalate for Nationwide at various times in 2012.  However, the relationship between Nationwide and ECI began to deteriorate around the end of 2012.

68.  After the relationship deteriorated, Nationwide returned ECI's technology package for Salsalate to ECI. Exhibit 3 at ¶ 7.

69.  In addition, ECI never disclosed its API supplier(s) for Salsalate. Id. ¶¶ 5, 11.

70.  Accordingly, ECI knew or should have known that Salsalate marketed by Nationwide or its affiliate Bi-Coastal <u>years later</u> must have been sourced by some entity other than ECI.

71.  In or about November of 2014, ECI learned that Bi-Coastal was in the process of selling its Salsalate business to Acella.  ECI was a competitor of Bi-Coastal in the Salsalate market and was engaged in active litigation with Bi-Coastal.

CASE NO.

72.  Determined to attempt to take down its competitor Bi-Coastal, ECI published a number of false statements to Acella including that:

    i.  Bi-Coastal had misappropriated Salsalate from ECI;

    ii.  Bi-Coastal did not have legal title to the Salsalate product that Acella was contemplating purchasing;

    iii.  Bi-Coastal's marketing of Salsalate violated ECI's intellectual property rights;

    iv.  Bi-Coastal had extended the dating of units of the Salsalate product, including product that Acella was contemplating purchasing, without informing or obtaining the permission of its manufacturer; and

    v.  Bi-Coastal's marketing of Salsalate was in violation of Title 21 of the United States Code (Food and Drugs).

73.  The statements published by ECI set forth in ¶ 72(i)–(v), supra, are false.

74.  The statements published by ECI set forth in ¶ 72(i)–(v), supra, are defamatory.

75.  ECI acted with knowledge or reckless disregard as to the falsity of the statements published to Acella set forth in ¶ 72(i)–(v), supra.

76.  In the alternative, ECI was negligent in publishing the statements set forth in ¶ 72(i)–(v), supra.

77.  ECI published the statements set forth in ¶ 72(i)–(v), supra, with the specific malicious intent to harm the reputation of Bi-Coastal and its CEO Ralph Massa, Jr.

78.  ECI's publication of the statements set forth in ¶ 72(i)–(v), supra, was a proximate and contributing legal cause to Acella's decision not to purchase Bi-Coastal's Salsalate

CASE NO.

business.  Accordingly, Bi-Coastal did not realize the anticipated profits for the sale of its Salsalate business to Acella as a result of ECI's wrongful conduct.

79. Bi-Coastal has suffered actual damage in excess of $75,000.00, exclusive of interest and costs, as a result of ECI's publication of the statements set forth in ¶ 72(i)–(v), supra.

WHEREFORE, Plaintiff Bi-Coastal respectfully requests this Honorable Court enter judgment in its favor for compensatory damages, punitive damages, attorney's fees, costs, interest and such further and other relief as this Court deems just.

<u>COUNT III</u>
(Tortious Interference with an Advantageous Business Relationship: Bi-Coastal)

80. Plaintiff, Bi-Coastal hereby adopts and reincorporates herein by reference the allegations contained in paragraphs one (1) through sixty (60).

81. ECI manufactured Salsalate for Nationwide at various times in 2012.  However, the relationship between Nationwide and ECI began to deteriorate around the end of 2012.

82. After the relationship deteriorated, Nationwide returned ECI's technology package for Salsalate to ECI. Exhibit 3 at ¶ 7.

83. In addition, ECI never disclosed its API supplier(s) for Salsalate. Id. ¶¶ 5, 11.

84. Accordingly, ECI knew or should have known that Salsalate marketed by Nationwide or its affiliate Bi-Coastal <u>years later</u> must have been sourced by some entity other than ECI.

85. In or about October of 2014, Acella's Director of Business Development Benjamin Burgess and Art Deas approached Bi-Coastal's President and CEO Ralph Massa, Jr. and inquired whether Bi-Coastal may be interested in selling its business for a certain prescription medication, Salsalate.

CASE NO.

86. On October 23, 2014 Acella and Bi-Coastal entered into a Confidentiality Agreement so that they could exchange Confidential Information with the goal of consummating the sale of Bi-Coastal's Salsalate business to Acella.

87. Bi-Coastal shared its Confidential Information with Acella and the parties engaged in negotiations concerning the price for the acquisition of Bi-Coastal's Salsalate business.

88. In or about November of 2014, ECI learned that Bi-Coastal was in the process of selling its Salsalate business to Acella.  ECI was a competitor of Bi-Coastal in the Salsalate market and was engaged in active litigation with Bi-Coastal.

89. By November of 2014 Bi-Coastal had an advantageous business relationship with Acella as evidenced by the Confidentiality Agreement, the sharing of Confidential Information, and negotiations concerning the price for the acquisition of Bi-Coastal's Salsalate business.

90. ECI intentionally and without justification interfered with Bi-Coastal's advantageous business relationship with Acella through its publication of a number of false statements to Acella including that::

    i.  Bi-Coastal had misappropriated Salsalate from ECI;

    ii.  Bi-Coastal did not have legal title to the Salsalate product that Acella was contemplating purchasing;

    iii.  Bi-Coastal's marketing of Salsalate violated ECI's intellectual property rights;

    iv.  Bi-Coastal had extended the dating of units of the Salsalate product, including product that Acella was contemplating purchasing, without informing or obtaining the permission of its manufacturer; and

CASE NO.

        v.  Bi-Coastal's marketing of Salsalate was in violation of Title 21 of the United States Code (Food and Drugs).

91. ECI published the statements set forth in ¶ 90(i)–(v), supra, with the specific malicious intent to interfere with Bi-Coastal's advantageous business relationship with Acella.

92. ECI's interference with Bi-Coastal's advantageous business relationship with Acella, including by and through its publication of the false statements set forth in ¶ 90(i)–(v), supra, was a proximate and contributing legal cause to Acella's decision not to purchase Bi-Coastal's Salsalate business and otherwise terminate their advantageous business relationship. Accordingly, Bi-Coastal did not realize the anticipated profits for the sale of its Salsalate business to Acella as a result of ECI's wrongful conduct.

93. Bi-Coastal has suffered actual damage in excess of $75,000.00, exclusive of interest and costs, as a result of ECI's interference with its advantageous business relationship with Acella.

WHEREFORE, Plaintiff Bi-Coastal respectfully requests this Honorable Court enter judgment in its favor for compensatory damages, punitive damages, attorney's fees, costs, interest and such further and other relief as this Court deems just.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury on all legal claims against ECI.

PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests this Honorable Court enter judgment finding:

1.  that the Salsalate Agreement [Exhibit 1] governs the relationship between Nationwide and ECI relative to the payment terms due for the supply of Salsalate;

CASE NO.

2.  that Nationwide does not owe ECI any compensation under the Salsalate Agreement for any Salsalate it has marketed that did not use ECI's technology package or API/API suppliers, including Salsalate manufactured by New Manufacturer;

3.  that the Phenazopyridine Agreement [Exhibit 2] governs the relationship between Nationwide and ECI relative to the payment terms due for the supply of Phenazopyridine;

4.  that Nationwide does not owe ECI any compensation under the Phenazopyridine Agreement for any Phenazopyridine it has marketed that did not use ECI's technology package or API/API suppliers, including Phenazopyridine manufactured by New Manufacturer;

5.  awarding Plaintiffs' compensatory damages, punitive damages, attorney's fees, costs, interest; and

6.  for any other relief that this Honorable Court may deem necessary and just.

Respectfully submitted on August 17, 2015,

Wicker, Smith, O'Hara, McCoy & Ford, P.A.
515 E. Las Olas Boulevard
SunTrust Center, Suite 1400
Ft. Lauderdale, FL 33301
Phone: (954) 847-4800
Fax: (954) 760-9353

/s/ Jordan S. Cohen
Jordan S. Cohen, Esquire
Florida Bar No. 551872
jcohen@wickersmith.com
Carlos A. Garcia, Esquire
Florida Bar No. 99768
cgarcia1@wickersmith.com